UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 1:08CR 77 ERW |
| ) | |
| JONATHAN LEE JENKINS, ) | |
| ) | |
| Defendant(s). ) | |

**REPORT AND RECOMMENDATION**

Jonathan Le Jenkins filed Defendant's Motion to Suppress Evidence (Document #23). The government filed its Response (Document #24). Two hearings were held on defendant's motion which were followed by memoranda by the parties. It is the defendant's claim that "any physical evidence seized from the person or possession of defendant, or otherwise seized, was seized as a result of searches and other illegal intrusions into defendant's person and property without a valid search warrant issued upon probable cause and not pursuant to a lawful order or any other legal justification...."

**Factual Background**

Cape Girardeau, Missouri, Police Officer Michael Kidd testified that on March 26, 2008, he was on duty and in uniform at about 10:00 A.M. and was in the 200 block of Lorimier Street in Cape Girardeau. Officer Kidd heard loud music which he believed to be coming from a red Chevrolet Monte Carlo, and Kidd noticed that the sound grew louder as the Monte Carlo approached his position. Cape Girardeau has a city ordinance called "Prohibited Acts" that proscribes playing loud music that can be heard from more than fifty feet away. Kidd testified that when he first heard the

music from the car that it was more than fifty feet away. Officer Kidd then made a traffic stop based upon that violation. He noticed also that Mr. Jenkins was not wearing a seatbelt which was a further violation.

Kidd identified the driver of the vehicle as the defendant, Jonathon Lee Jenkins, and the passenger as a Nicholas Young. Officer Kidd noticed that Jenkins would not make eye contact with him, which Kidd characterized as being "odd." While Kidd was writing the defendant his tickets, a computerized records check came back indicating that both the defendant and Young were on parole for drug convictions. The record check also indicated that the Monte Carlo was registered to a person who was not an occupant of the vehicle at that time. When queried on that point, the defendant indicated that he had recently purchased the vehicle.

Jenkins was issued citations for loud music and failure to wear a seat belt. Officer Kidd then asked Jenkins if "he had any guns, knives, drugs, or anything of an illegal nature in the vehicle," to which the defendant replied "No."

Officer Kidd then asked Jenkins, "Do you mind if I search the vehicle for anything illegal?" Jenkins responded, "Yes, I do mind, but no I don't mind." Because this answer confused the officer he restated the question to Mr. Jenkins and directly asked, "Can I search your vehicle and the contents for anything illegal?" Jenkins responded, "Yeah" and simultaneously opened the driver's side door to get out. Kidd testified that the time period between giving Jenkins the citations and the point where Jenkins consented to the search was about 20 seconds.

Immediately upon Jenkins opening the car door, Officer Kidd observed two syringes in the driver's door pocket. Kidd asked Jenkins if he was a diabetic, to which Jenkins responded, "No." Kidd located a bag underneath the center console of the vehicle which contained what Officer Kidd

recognized, given his training and experience, to be illegal drugs. This was later field-tested and identified as being methamphetamine.

While Kidd was searching the vehicle Cape Girardeau Police Officer Hickey, who had heard of the stop on his radio and had arrived, was watching the occupants. Officer Hickey overheard Nick Young ask Jenkins, "Did you tell them that they could search the car?" Jenkins responded, "Yeah, because they would somehow. They would get a dog over here and search it anyway, so I said yes."

After locating the drugs in the vehicle, Officer Kidd told both Jenkins and Young that they were under arrest. Both Jenkins and Young attempted to flee on foot, but Jenkins tripped over the curb and fell on the ground, and Jenkins was placed into custody. Upon lifting Jenkins off the ground, the officers discovered an additional bag of what they believed to be a controlled substance lying on the ground underneath him. This item later field-tested positive for cocaine base.

## Discussion

## Voluntariness of Consent

The court finds the defendant gave consent to the search of the vehicle he was driving. When asked if he minded if Officer Kidd searched the vehicle for anything illegal, the defendant responded, "Yes, I do mind, but no I don't mind." (Tr. p. 8).[1] Since the defendant's response was somewhat ambiguous, Officer Kidd asked again whether he could search the vehicle and the contents for anything illegal. The defendant then stated, "Yeah." It is clear to the court that the defendant's earlier response of "Yes, I do mind, but no I don't mind." was stating his reluctance to the search but

---

[1] There were three hearings referred to during testimony. "Tr." in this report refers to the transcript of the suppression hearing in this case on July 9, 2008. The transcripts of the suppression hearing on September 11, 2008, and the state preliminary hearing, when cited in this report, are specifically identified.

even though he did not like it, he was consenting to the search, which is evident from his second response.

The court finds the defendant's consent to the search was voluntary. This conclusion is also supported by the testimony of Officer Darren Hickey, who stated at the evidentiary hearing that he overheard the defendant's companion. Nick Young, ask the defendant, "Did you tell them that they could search the car?" The defendant answered, "Yeah, because they would somehow. They would get a dog over here and search it anyway, so I said yes." (Tr. p. 28).

As the parties know, a search based on consent may be made by law enforcement officers without a warrant or probable cause, and any evidence discovered during the scope of the search may be seized and admitted at trial. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). To determine whether consent was given voluntarily, courts examine the totality of the circumstances surrounding the consent. Id., 412 U.S. at 227. Defendant's own statement to companion Young acknowledging that he told Officer Kidd that the officer could search the vehicle is persuasive evidence that the consent was voluntary.

Factors that weigh on the court's determination of voluntariness include: (1) knowledge of the constitutional right to refuse consent; Id. at 227; United States v. Becker, 333 F.3d 858, 861-62 (8th Cir. 2003)(consent voluntary despite fact that officers did not inform suspect of rights, because suspect had knowledge of rights from prior experience with law enforcement); the defendant has been convicted of three felonies-Distribution, Manufacture of a Controlled Substance, Distribution of a Controlled Substance, and Possession of a Controlled Substance-all in the Circuit Court of Cape Girardeau County, between 1998 and 1999; twice he has had his probation revoked; between 2005 and 2007 he had his parole revoked three times; the defendant has had sufficient contact with the legal

system to understand his rights; (2) age, intelligence, education, and language ability; Schneckloth, 412 at 226; United States v. Jimenez, 478 F.3d 929, 932 (8th Cir. 2007)(consent voluntary because "[t]here was no indication that [defendant] did not understand the officer's questions"); the defendant graduated from high school; he showed no lack of understanding of the officer's questions to him and satisfactorily explained to Nick Young why he consented to the search; (3) the degree to which the individual cooperates with the police; United States v. Saenz, 474 F.3d 1132, 1137 (8th Cir. 2007)(consent voluntary because defendant gave consent to search truck to two officers and did not complain or question officers during the search); although the defendant gave his consent reluctantly, he gave it understanding that he could refuse consent; he did not ask or tell the officers to stop during the search or restrict the search in any way; (4) the individual's attitude about the likelihood of the discovery of contraband; United States v. Hathcock, 103 F.3d 715, 720 (8th Cir. 1997)(consent to search duffle bag voluntary because suspect believed officers would inevitably detect illegal substances inside); as the defendant told Nick Young, he thought the officers could bring a drug dog and would find the drugs anyway; (5) the length of detention and the nature of questioning including the use of physical punishment or other coercive police behavior; Schneckloth, 412 U.S. at 226; there was no evidence of any type of coercive police behavior or physical punishment and the detention was of very short duration.

The court finds the defendant's consent to the search of the vehicle he was driving was voluntary and made with understanding.

### **Inconsistencies in Officer Kidd's Testimony**

In his post-evidentiary hearings Memorandum (Document #50), the defendant calls into question the credibility of Officer Michael Kidd, the government's principal witness, by citing what

the defendant describes as inconsistencies in Officer Kidd's testimony and other alleged inconsistencies between Kidd's testimony and that of another Cape Girardeau police officer, Brad Smith.

The court points out that any real or perceived inconsistencies in a witness's testimony is for the jury to consider in determining the guilt or innocence of Defendant Jenkins at a trial. In addition, any real or perceived inconsistencies in Officer Kidd's testimony is a matter for the court to consider in judging Kidd's credibility when it determines the validity of the search of the vehicle the defendant was driving.

The defendant argues the first inconsistency concerns where the crack cocaine was found. The defendant claims that Officer Kidd's testimony that a white substance was found after he "lifted the center console of the vehicle" is inconsistent with his prior testimony at the preliminary hearing held in state court that the controlled substance was found "under the console, not actually in it, but underneath the console..." The defendant continues that Officer Kidd testified at the evidentiary hearing on the motion to suppress that crack cocaine was found "on the street." Defendant points to Officer Kidd's response when asked if he had ever told fellow Cape Girardeau Police Officer Brad Smith that crack cocaine was found underneath the driver's seat. Kidd had responded in the negative. The defendant continues that Officer Smith testified at the state preliminary hearing that Officer Kidd had told him that Kidd had found the crack cocaine underneath the driver's seat. For all the references to testimony, the defendant in his memorandum gives transcript citations which the court is not repeating in this report.

The government has painstakingly reviewed the alleged inconsistencies claimed by the defendant and points out that there were two types of drugs located in two separate locations during

the encounter between Mr. Jenkins and the Cape Girardeau Police Department. An amount of what later turned out to be methamphetamine was located in a black bag in the car the defendant was driving. Also an amount of crack cocaine was recovered from the street underneath where the defendant fell after his attempt to flee.

The court will not repeat the government's very close examination of the various testimony given on three different occasions, the two suppression hearings and the preliminary hearing in state court. The court finds that there was no inconsistency in Officer Kidd's testimony. Concerning the location of either the methamphetamine under or below the console or the crack cocaine underneath the defendant when he tripped while trying to escape and fell, the government's analysis covers four and one-half pages of close reading of Officer Kidd's testimony and to repeat it in this report would be tedious for the reader to consider. Government's discussion goes from page 4 to page 9 of its post-hearings memorandum.

Any apparent inconsistency between Officer Kidd's testimony and what Officer Brad Smith remembered about Kidd's telling him where the drugs were found five months previously, (when Officer Smith was not present at the search of the vehicle), is easily explained by the lapse of time and the normal differences contained in the testimony of witnesses (although Officer Smith was not a witness to the search) about what occurred at a time and place.

Defendant next argues that Officer Kidd's testimony about where telephones were found (both in a black bag) and information in his police report (one in the bag and one on the defendant's person) were inconsistent. When questioned at the suppression hearing, Kidd admitted that his report was in error.

Defendant next argues that there was an inconsistency in Officer Kidd's testimony about

whether he observed "suspicious behavior" by Defendant Jenkins.

Again, the government has taken the time and trouble to repeat and analyze the testimony at the suppression hearings and the state preliminary hearing and concludes correctly that Officer Kidd's answer that he did not observe with his eyes that the two persons in the vehicle the defendant was driving were up to something illegal, was in response to his being asked by a defense attorney if he saw anything illegal in the car, guns, drugs, anything illegal. The question immediately prior to the defense attorney's question whether Officer Kidd observed something illegal was "When you came up to the window of the vehicle the first time or the second time, did you observe anything illegal inside the vehicle?" (Transcript of preliminary hearing, p. 8). The question immediately following Kidd's answer in the negative was again about the contents of or actions in the car, "not in the trunk or somebody was smoking marijuana or anything like that?" (Tr. of preliminary hearing, p. 9). It is clear Officer Kidd's testimony at the state preliminary hearing was in response to questions as he understood them about what, if any, illegal items or illegal actions he saw inside the vehicle. That is quite different from the defendant's summary of Officer Kidd's response to the question at the suppression hearings, whether he observed anything suspicious about the defendant's behavior to which Kidd responded, "the drug history, and being on parole, his passenger on parole, the vehicle being registered to someone else, and you know, simply that he would not make eye contact with me...."(Defendant's summary in post-hearing memorandum (Document #50), pp. 3, 4).

The court finds that what the defendant alleges is an inconsistency about whether Kidd observed anything illegal in the car at the state preliminary hearing and his observation of "suspicious behavior" by the defendant after the vehicle stop in Kidd's testimony at the suppression hearing are really answers to different questions. The court finds no inconsistency in Officer Kidd's testimony

on each of the occasions.

The next inconsistency the defendant points to concerns the timing of Officer Kidd's questions about the presence of anything illegal in the vehicle in the state hearing (Tr. preliminary hearing, p. 2) and "I then asked him if he had any guns, knives, drugs, or anything of an illegal nature in the vehicle" at the first suppression hearing. (Tr. suppression hearing July 9, 2008, p. 8). At the second suppression hearing, Kidd was asked when it was that he questioned the defendant about anything of an illegal nature with respect to the time when he gave the defendant the tickets or the citations. Officer Kidd responded, "Almost simultaneous to giving him the tickets. I explained the tickets to him and then just in the same comments asked him." After setting out the various quotations from the two suppression hearings and the state preliminary hearing, the government's response to the defendant's claim of inconsistencies is apposite:

> A fair reading of each of these snippets of testimony indicates that immediately after issuing the tickets and probably in the same breath, Kidd asked the defendant if he had anything illegal in the vehicle. To say that these comments are somehow inconsistent with each other is nothing more than a word game. "at that point", "Directly upon giving him the tickets", "Almost simultaneous to giving him the tickets", "immediately following" and "directly after" all indicate that he asked very shortly in time after giving Jenkins the tickets. To say that these statements contradict each other because the witness uses different terms to express the identical idea is truly a distinction without meaning. This is particularly so, where all the evidence indicates that the whole conversation from start to Jenkins grant of consent took place in a matter of a few seconds, as demonstrated elsewhere herein.

(Government's Reply Brief, P. 15).

As noted earlier, the defendant can argue to a jury what the defendant perceives as inconsistencies in Officer Kidd's testimony. The court finds that what is important in Officer Kidd's testimony is that methamphetamine was found in the vehicle the defendant was driving underneath the center console and crack cocaine was found under the defendant when he fell after attempting

to run away from the officers; the court finds that the location of the cellular telephones, either on the defendant's person or in the black bag or one in the black bag and one on the defendant's person (which appears to have been accurate), is really immaterial since the cell phones were found and considered to be the possession of Defendant Jenkins; the court finds no inconsistency between Officer Kidd's testimony at the state preliminary hearing and his testimony at the suppression hearings. His talk in the preliminary about "illegal activity" referred to the contents of the vehicle, "guns, drugs, anything illegal." His reference in the suppression hearings to what was "odd" about the defendant or "suspicious," the defendant's failure to make eye contact with Officer Kidd, his prior conviction for drug offenses and his presently being on parole, the prior conviction for a drug offense by his companion and his companion being on parole, and the fact that the defendant was driving a vehicle that belonged to neither of the occupants, referred to what he thought was suspicious. What is significant is that Officer Kidd observed what he felt was suspicious behavior or circumstances in connection with the defendant which led him to ask the questions about the presence of weapons or illegal substances. Finally, the alleged inconsistency in the timing of Officer Kidd's questioning of the defendant is not a true inconsistency. The parties agree in their memoranda that the questions began after Officer Kidd gave the defendant the tickets. And that leads to the next question: the legality of the search of the vehicle the defendant was driving.

## **The Legality of the Search**

The defendant maintains that Officer Kidd detained Jonathon Jenkins beyond the scope of the traffic stop without reasonable suspicion of criminal activity which resulted in an illegal seizure rendering the subsequent search of the vehicle violative of Jenkins's Fourth Amendment rights and making the contraband found inadmissible.

The parties agree that Officer Kidd gave the tickets to the defendant and then began to ask questions about the presence of contraband.

The defendant had been legitimately stopped for violation of a Cape Girardeau city ordinance titled "Prohibited Acts" that proscribes, among other activities, loud music that can be heard for more than fifty feet away. The defendant has not disputed the violation nor the propriety of the stop.

Not all encounters between individuals are seizures governed by the Fourth Amendment. "[N]ot every encounter between a police officer and a citizen is an intrusion requiring an objective justification." United States v. Mendenhall, 446 U.S. 544, 553 (1980). "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." Terry v. Ohio, 392 U.S. 1, 34 (1968).

The government points to United States v. Galvan-Muro, 141 F.3d 904 (8th Cir. 1998), involving a traffic stop in which a trooper gave the suspect a written warning and his documents and then asked the driver about his criminal history and if he had any drugs or weapons in the vehicle. The trooper then asked for and received consent to search the car in which was discovered a large quantity of a controlled substance. Like Mr. Jenkins, Galvan contended that the trooper's further questioning converted the otherwise legitimate stop into an investigatory stop and there was no reasonable suspicion to justify the further detention under Terry v. Ohio. As the government quotes the Eighth Circuit in Galvan-Muro:

> Galvan had everything he needed to lawfully proceed on his journey, so that a reasonable person would feel free to leave. Thus, [Trooper] Goltz's request to search came during a consensual encounter and was permissible without reasonable suspicion...The search of Galvan's car did not arise from an unreasonable detention. Galvan-Muro, 141 F.3d 904, 907. (Internal citations omitted)

The Court, in Galvan-Muro, listed circumstances indicative of a seizure which may include:

> ' the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' United States v. White, 81 F.3d 775, 779 (8th Cir.) (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)), cert. denied.

Id., 141 F.3d at 906.

None of the circumstances indicative of seizure listed in the last quotation above were present when Officer Kidd began to ask Mr. Jenkins questions. (Tr. pp. 13, 30-31). Officer Darin Hickey did respond to see if Officer Kidd needed assistance when he heard of the stop on his radio. At some point, Officer Bradley Smith showed up and had limited participation. (Tr. Sept. 11, 2008 hearing, p. 38). The officers' presence at the scene was not intimidating. In the Galvan-Muro case, four officers were present and the Court of Appeals found the encounter consensual.

The court finds that the questioning by Officer Kidd of Mr. Jenkins took place during a "consensual encounter" and there was no seizure. In such a case, the Fourth Amendment is not implicated and the officer may ask questions unrelated to the traffic stop and request consent to search. United States v. Williams, 431 F.3d 296, 298 (8th Cir. 2005). See also, United States v. Flores-Sandoval, 474 F.3d 1142, 1145-46 (8th Cir. 2007) (no seizure when officer, who arrested defendant for crime for which defendant was presently being released from custody, showed his badge and asked questions on sidewalk next to the jail); United States v. Swindell, 407 F.3d 562, 572-73 (2nd Cir. 2005) (no seizure of driver when police ordered stop by activating patrol car lights because no immediate physical force or submission to authority); United States v. Thornton, 463 F.3d 693, 698 (7th Cir. 2006) (no seizure when three officers asked the defendant questions at a gas station because no weapons displayed, no physical contact and no harsh tone of voice); United States v. Lockett, 406

F.3d 207, 211 (3rd Cir. 2005) (no seizure when police approached suspect at train station, identified themselves as law enforcement officers, asked questions, and asked to search suspect's bags); United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005) (no seizure when trooper questioned driver because no show of authority that would indicate to reasonable person that he was not free to leave).

Even had the encounter between Officer Kidd and Jonathon Jenkins not been "consensual," grounds were present to consider the encounter as it progressed to questioning a valid investigatory detention. Officers acting upon a reasonable suspicion that an offense has occurred, is occurring or is about to occur, may briefly detain an individual for the purposes of investigation. Terry v. Ohio, 392 U.S. 1 (1968). Reasonable suspicion requires that the officer must have more than a "mere hunch," but the likelihood of criminal activity being afoot need not rise to the level of probable cause and falls considerably short of satisfying a preponderance of the evidence standard. United States v. Arvizu, 534 U.S. 266, 274 (2002). The test for determining reasonable suspicion is based upon an examination of the totality of the circumstances confronting the officers. United States v. Cortez, 449 U.S. 411, 417 (1981).

Officer Kidd felt that it was odd that the defendant would not make eye contact with him during the traffic stop. This was not typical in the officer's experience. (Tr., p. 7). After there was a computerized check of Mr. Jenkins's record, Officer Kidd learned that Mr. Jenkins was on parole for drug activity, the passenger was also on parole for prior drug activity and the license plate on the vehicle checked to that vehicle but it was registered to someone else who was not an occupant of the vehicle. Id. Kidd felt that those circumstances were suspicious. (Tr., p. 9).

There is another circumstance which was not mentioned specifically by Officer Kidd but was a fact implicit in Kidd's description of both occupants of the automobile as being on parole for drug

- 13 -

offenses. The additional circumstance is that the two convicted drug offenders were together and it would be reasonable that a police officer would know that convicted felons while on parole are not permitted to associate with other convicted felons. The Court, in Terry, emphasized that the assessment of the circumstances be evaluated "... against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." Id. at 21, citing Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280 (1985); Beck v. State of Ohio, 379 U.S. 89, 96-97, 85 S.Ct. 223, 229 (1964). Although Officer Kidd did not specify that an additional suspicious circumstance was that the two convicted felons were associating together in violation of normal parole rules, the test is what would warrant an officer of reasonable caution to believe he should make a further investigation. Id. The improper association of the two felons is an additional reasonable, articulable fact.

The court finds that the circumstances which presented themselves to Officer Kidd when he began to question the defendant on March 26, 2008, provided "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] that intrusion." Id.

The court finds that the continuation of the meeting of Officer Kidd and Jonathon Jenkins after the delivery of the citations was a consensual encounter and that circumstances arising during that encounter provided reasonable suspicion warranting further questioning.

The court finds the encounter between Kidd and Jenkins which led to the consensual search of the vehicle and the discovery of contraband did not violate the Fourth Amendment. The items found in the car, on the defendant's person or under the defendant when he fell while fleeing, were legally seized and are admissible in evidence.

The court appreciates the thorough and detailed discussion of the issues contained in the

parties' memoranda or briefs. The memoranda were very helpful to the court.

For all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Document #23) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of December, 2008.